No. 6620.

MARY E. KIRKPATRICK, WIFE OF J. J. O'BRIEN VS. FINNEY & BYRNES ET AL.

When the creditors of a husband attack the title of his wife to real estate acquired by her after a judgment separating them in property, the fact that she had no separate property at the time of marriage, and no separate occupation or business since the marriage, or other source of getting money except from him, will be considered a conclusive badge of fraud upon the attacking creditors, and will justify their charge of simulation against the title held by her.

Although the salary of a public officer is exempt from seizure under execution, whenever such salary ceases to be due and the money is reduced into possession, its exemption ceases, and it becomes liable to seizure or garnishment if he has loaned

Kirkpatrick *vs.* Finney & Byrnes.

it out, or deposited it in a bank, just as any other debt due him would be, and if he has bought property with such money, the property so bought is on the same footing as property bought with any other funds.

A husband who is insolvent cannot invest his salary in property in the name of his wife, and thus shield that property from the pursuit of his creditors.

All gratuitous donations are presumed to have been made in fraud of creditors if, at the time of making them, the donor had not more than twice their amount over and above his debts, and this rule applies with greater force to donations made by a husband to his wife, and prevails whether the donation is made by an authentic act or by manual gift.

APPEAL from the Fourth District Court of New Orleans. HOUSTON, J.

*Semmes & Mott* for Plaintiff and Appellant. *B. Egan* for Defendant.

EGAN, J. Plaintiff, a married woman claiming to be separated in property by judgment, injoins the seizure under *fieri facias*, issued upon a judgment in favor of Finney & Byrnes *v.* her husband, of a house and lot in New Orleans upon the ground that it is her separate or paraphernal property.

The defendant creditors deny the existence of any valid judgment of separation, and of any title in plaintiff to the property seized — aver, with elaboration and many particular amounts and allegations, that the pretended judgment of plaintiff *v.* her husband was obtained without legal grounds or evidence, and is without legal effect; that it was obtained the better to enable the husband to avoid the just pursuit of his creditors; that the property seized was purchased by the husband with his own funds, but in his wife's name with the same purpose; and that the pretended title set up by the wife is simulated and fraudulent.

It appears from the evidence that the husband, O'Brien, failed in business, as a merchant in this city, to a large amount. That Finney & Byrnes were among his creditors, and subsequently obtained the judgment sought to be enforced in the proceeding injoined. That O'Brien was, soon after his failure, elected to a lucrative office, that of Clerk of the Sixth District Court of Orleans, the revenues of which are variously estimated, but are shewn to be worth several thousands of dollars per annum; that within a few weeks after his election, he married the plaintiff, a young lady without means or property other than, perhaps, the furniture of her bed-room.

The judgment of separation soon followed and then the purchase of the house and lot in question for the price of eight thousand dollars, one-third cash and the balance in one and two equal annual installments, and the title was taken in the name of the wife, plaintiff.

The cash payment was made with money borrowed on a note executed in the name of the wife with the authorization of the husband, *which is still unpaid.*

The negotiations both for this loan and for the purchase of the property were conducted by the husband. The vendor testifies that he did not know, and never saw Mrs. O'Brien; and the broker to whom he referred O'Brien to fix the terms and make the sale swears that he conferred and dealt with the latter alone, although O'Brien told him the purchase was for his wife, and the title taken in her name, according to O'Brien's directions. Subsequent to the sale of the property, which is occupied as a residence by O'Brien and his wife, the vendor, being in want of money, went to the office of O'Brien, and proposed to him to discount one of the notes given for the purchase price in advance of its maturity. O'Brien did so, and paid the money and the vendor promised him that if he should, at any time, desire to discount the other purchase price note, he would give him, O'Brien, the preference.

Mrs. O'Brien was not present, nor mentioned in this transaction. She is shewn to have been without means, or occupation by which to acquire means, to make the purchase independent of her husband, and was, besides, in health too delicate to have engaged in any occupation, or even to visit and confer with the attorneys employed to prosecute this case.

This also was attended to by the husband.

Her want of means is made the more apparent by the fact that the money to make even the cash payment was borrowed, and that the note given for this loan was repeatedly extended and was still unpaid at the time of the trial below.

If this were a real transaction on her part, and it should be claimed that the discounting of the time note was with her funds and for her benefit, of which there is not a particle of evidence, it is, to say the least, singular that she should have left this note unpaid, and anticipated the payment of the note not due upon the terms stated by the witness, *i.e.*, a discount of the interest only.

Kirkpatrick *vs.* Finney & Byrnes.

In point of fact, the evidence satisfies us that she was without means or any basis of credit to make either the loan, the purchase, or the discount; and that the husband, who held a lucrative office, alone had the means or credit to do so.

It is, however, urged that the fees or salary of office of the husband was exempt from seizure by his creditors, who were, therefore, not injured and could not complain if he thought proper to give them to his wife, and thus enable her to make the purchase in question, and we are urged by ingenious counsel to infer that he did so.

It is sufficient answer to this argument to say that whatever he might have done, there is not a scintilla of evidence in the record to shew that O'Brien ever made or attempted to make any such gift of money, or of the means by which money could be realized, either by manual delivery or otherwise.

In response to the direct charge of simulation and fraud, and in order to avoid the effects of the seizure complained of, and establish her contested title, it was the interest and duty of the plaintiff to have shewn this state of facts, had it existed.

It was not shewn, and we cannot infer it. A most lengthy and elaborate power of attorney is found in the record from Mrs. O'Brien to her husband, by which she surrenders to him all individuality, and clothes him with almost every conceivable power to act for her in almost any conceivable case; this only strengthens the conclusion that she is in all this a mere puppet, or person interposed. It is certainly a most extraordinary document, and will be considered as a preparation to enable the husband to act for his own purposes in her name.

*Judgment amended so as to give the defendants $300 special damages as attorney's fee on dissolution of the injunction.*

On the application for re-hearing.

SPENCER, J. It is shewn, and not disputed, that at the time of plaintiff's marriage with John J. O'Brien, she had no property whatever, except a set of bed-room furniture, which is not identified in either of the injunction suits, and was not identified in her separation suit against her husband.

She had no separate occupation or business, or any other conceivable source of getting money, except *by donations from her husband,* who, after failing as a merchant, was elected clerk of the Sixth Dis-

trict Court of Orleans, an office shewn to be worth a large amount annually.

In this application for rehearing, the counsel for plaintiff frankly assumes (for the sake of the argument we presume, though the fact is in truth not controvertible), that the money with which the house and lot and furniture seized in these cases, was bought, was furnished to plaintiff by her husband O'Brien, or they were paid for by him.

But he assumes that this money was from the revenues of his office, and therefore exempt from seizure, and therefore that he had a perfect right to give it to his wife, or invest it *in her name*, which last was the fact in this case.

Conceding for the sake of the argument, in our turn, that this money so invested and used in the wife's name was derived from the the salaries of his office, we do not agree with the conclusion that, when *received by him* and *reduced* to possession, it was exempt from seizure.

It ceased to be money " *due* for the salary of an office; " had he deposited it in a bank, or loaned it, it would have been liable to seizure or garnishment as any other debt due to him. So if he invested it in property, the property bought with it would not be exempt.

The intention of the law exempting moneys due for the salaries of office is manifest. It is to prevent creditors depriving, by seizures under garnishment, and by anticipation, the officer of the means of living and, therefore, to prevent them from being deprived of ability to carry on the public business.

But after the salary has been received and reduced to possession, it does not differ from other property; and property bought with it does not stand on a different footing from that bought with any other fund.

The consequences of the doctrine that the law will undertake to ferret out, follow up, and trace the devious course of the salary of an office, after it is reduced to possession, lead to such absurdity as to render it untenable.

After O'Brien, therefore, received the moneys accruing from his office, he could make no other or different disposition thereof, than could a man who received it from the proceeds of a cotton crop, or from any other source.

Kirkpatrick *vs.* Finney & Byrnes.

This brings us then to the naked question, *Can a man who is largely in debt — in fact insolvent,* — take large sums of money out of his pocket and give them to his wife, and invest them in her name, to the prejudice, and in defiance, of the rights of his creditors?

It seems to us that in Louisiana to ask the question is to answer it.

1st. The law looks with suspicion and disfavor upon contracts of all sorts between husband and wife.

2d. It forbids, as a general rule, contracts between them. C. C. (old) 1784, 2421.

3d. By Art. 1975 (old) C. C., all purely gratuitous contracts "shall be presumed to have been made in fraud of creditors, if, at the time of making them, the debtor had not over and above the amount of his debts, more than twice the amount of the property passed by such gratuitous contracts."

This is the rule in all cases; *a fortiori*, as between husband and wife. And it does not matter whether "the donation," "the gratuity," be one evidenced by "Authentic Act," or by mere delivery as in case of "manual gifts."

4th. The law does not in any case give the same effect to donations between married persons made during marriage, that it does to donations to other persons. The former are always revocable at the will of the donor. C. C. (old), 1742.

5th. Contracts between husband and wife, must, as a general rule at least, be evidenced by authentic act.

These provisions at least shew the animus of our law unmistakably as the annunciations of Articles 1964 and 1965, C. C. (old).

The counsel urges that these acts of O'Brien, whereby he invested large sums of money in his wife's name, whilst he left his creditors unpaid, are either "*acts of beneficence or acts of fraud.*"

We agree with the counsel; and think that the above quoted Art. 1975, enunciates with sufficient distinctness the class to which the law assigns them. The counsel urges that this court "places *an evil construction* on every act of the husband. Instead of interpreting his acts as those of a loving husband, solicitous to provide for a delicate wife, his conduct is treated as that of a selfish man, unmindful of the obligations of a kind husband," etc.

It is sufficient answer to this to state that the "construction" this court puts upon his acts, is *that which the law* puts upon them.

The law *presumes* them to be " fraudulent."

It is our duty to apply the law, however much we may and do sympathize with that love and solicitude which prompts every man, who deserves the name, to provide for and shelter the wife of his bosom.

The presumed existence of these feelings, is the very cause why the law so jealously watches transactions between husband and wife.

Plaintiff's counsel argues that even if these transactions are under the law *fradulent*, they are not necessarily *simulated* and must therefore be attacked by revocatory action, and not by seizure.

This is true, and presents the most difficult point in the case. Owing to the intimate relation existing between man and wife, the usual *indicia* of simulation are not so seizable and apparent — such as the retention of possession, etc.

We think, however, that there are in this case some facts indicating that Mrs. O'Brien's possession was not real. She and her husband live together in New Orleans and perfectly accessibly to each other. Why should he under these circumstances take from her a most elaborate and almost universal power of attorney?

The counsel says it is only executed upon one of the usual notarial forms.

Concede that, and yet the question remains, why should he, under the circumstances of this case, take a power of attorney at all?

We think the judge below properly held Mrs. O'Brien's title to be simulated.

*Rehearing refused.*